IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT SCHMIDT,               )
                              )
            Plaintiff,        )      Civil No. 14-cv-112
                              )
      VS.                     )      September 26, 2014
                              )
BARTECH GROUP, INC., et al.,  )
                              )
            Defendants.       )
_____)


MOTIONS HEARING


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

 FOR THE PLAINTIFF:  COOK CRAIG & FRANCUZENKO PLLC
                     BY: JOHN C. COOK, ESQ.


 FOR THE DEFENDANTS: CHRISTIAN & BARTON LLP
                     BY: ROMAN LIFSON, ESQ.

                     REED SMITH LLP
                     BY: HELENANNE CONNOLLY, ESQ.


                     ---

OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR, CRR
                         U.S. District Court
                         401 Courthouse Square, 5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

<u>INDEX</u>

ARGUMENT BY THE PLAINTIFF     18

ARGUMENT BY THE DEFENDANT      3     28

---

1  (Thereupon, the following was heard in open
2  court at 10:35 a.m.)
3  THE CLERK:  1:14 civil 112, Robert Schmidt
4  versus Bartech Group, Incorporated, et al.
5  Would counsel please note your appearances
6  for the record.
7  MR. COOK:  Good morning, Your Honor.  John
8  Cook on behalf of the plaintiff.
9  THE COURT:  Good morning.
10  MR. LIFSON:  Good morning, Your Honor.  Roman
11  Lifson on behalf of defendant, the Bartech Group.
12  THE COURT:  Good morning.
13  MS. CONNOLLY:  Good morning, Your Honor.
14  Helen Connolly on behalf of Verizon Corporate Services
15  Group, VCSG.
16  THE COURT:  Good morning.
17  You may proceed.
18  MR. LIFSON:  Thank you, Your Honor.  Good
19  morning again.
20  As I mentioned, I represent the Bartech Group
21  which is one of the two defendants in this case.
22  Ms. Connolly represents Verizon.  We filed a
23  joint motion for summary judgment, and Ms. Connolly and I
24  have agreed to divide the argument in the following way.
25  I'll deal with the FLSA claim and the breach of contract

1    claim that's been filed against Bartech and then

2    Ms. Connolly will deal with the retaliation claim and the

3    *Bowman* claim as well.

4              THE COURT:  All right.

5              MR. LIFSON:  Your Honor, our briefs contain a

6    lot of the undisputed facts, and I certainly will not

7    reiterate all of those.  But I do want to start with

8    summarizing what we think are the key undisputed facts

9    pertaining to the motion for summary judgment.

10             THE COURT:  I understand that's your

11   preference.  My preference would be for you to state the

12   issues first before you start the facts.

13             MR. LIFSON:  Okay, very well.  The issues

14   pertaining to part of the argument that I'm covering are

15   has -- is summary judgment appropriate on Mr. Schmidt's

16   FLSA claim, meaning does he have a claim under the Fair

17   Labor Standards Act or is his claim simply a -- a breach

18   of contract claim?

19             And the second issue that I'm covering is

20   pertaining to Count III which he's asserted, which he

21   phrases in the alternative, a breach of contract claim

22   against Bartech on which we also feel that there is --

23   summary judgment should be entered in favor of Bartech on

24   that --

25             THE COURT:  So, was plaintiff an exempt

1    employee under the Fair Labor Standards Act?

2              MR. LIFSON:  Yes, sir.

3              THE COURT:  There's no question about that

4    really?

5              MR. LIFSON:  Well, I didn't think there was a

6    question on that for the following reason.  Mr. Schmidt

7    accepted a position and signed -- electronically signed a

8    work assignment form that specifically stated his

9    position was IT exempt.

10             When he was deposed he was asked, were you --

11   did you accept an exempt position?  He answered yes, I

12   did.

13             THE COURT:  Of course, that's not the end of

14   the inquiry.  But the indicia are he was a computer

15   professional and performed the type of work set forth in

16   the exemption?

17             MR. LIFSON:  That's right.  And there's no

18   dispute from the plaintiff that he met the duties portion

19   of the exempt position.  So, the only question is was he

20   paid in a way that met the exemption, as I understand the

21   argument.

22             THE COURT:  Now, as he filed suit for

23   overtime pay or is it for straight time?

24             MR. LIFSON:  For straight time, Your Honor.

25   And that also goes to the reason why he doesn't -- he has

1  not articulated an FLSA claim because the only relief he

2  seeks is for straight time. And that's calculated both

3  in his complaint. It's calculated in his Rule 26(a)(1)

4  disclosures and also in his deposition, he was explicitly

5  asked in this case, are you seeking time and a half or

6  straight time? And his answer was straight time. And

7  that's actually in -- on page 142 of his deposition which

8  is attached as Exhibit 1 to our opening brief.

9          THE COURT: Now, am I clear that the

10 plaintiff here did not tell anyone at Verizon about these

11 additional hours nor reported these hours to Bartech

12 Group; is that right?

13         MR. LIFSON: Exactly, Your Honor.

14 Mr. Schmidt was employed in this position from June 2012

15 until February of 2013. At no time did he -- and the way

16 he submitted his hours were -- into an electronic system

17 called Pace which goes into Verizon on a weekly basis.

18 Verizon then approves his hours. Then they get sent to

19 Bartech to be paid.

20         THE COURT: So to be clear, the employee has

21 an obligation to report -- self report his own hours?

22         MR. LIFSON: Exactly. There is no clocking

23 in or out. There is no supervisor who is monitoring his

24 time. It is a weekly timesheet submittal to the people

25 that he's -- that he's working for.

1    THE COURT:  So then, he never reported to

2  Bartech or Verizon, so how would we know what the

3  84 hours are?  Where did that number come from?  Is it

4  from two weeks, one week, ten weeks?  Where do we get the

5  number from?

6    MR. LIFSON:  It comes from the entire

7  duration of his employment.  And this is an allegation

8  that Mr. Schmidt has made.  We really have no way of

9  checking it.

10    He testified that he kept a paper journal in

11  which he wrote down the extra hours he worked, and

12  once -- when he started the case that's how he came up

13  with the calculation.  I think it's 84 and a half hours

14  over the entire duration of his employment.

15    Now, there's one small exception to whether

16  he reported extra hours and that's the following.

17    THE COURT:  The first timesheet.

18    MR. LIFSON:  In the very first timesheet, he

19  reported an hour and a half which now he says it was

20  actually three hours, but he felt bad about putting that

21  many overtime hours on his first week, so he only

22  reported an hour and a half.

23    And it's also important also where that --

24  how that reporting occurred.  And that reporting went in

25  the pay system.  It showed up as an hour and a half of

1    extra time.  And his -- one of his supervisors told him,

2    wait a minute, you know you're supposed to get

3    pre-approval for overtime hours.  You did not get

4    pre-approval for overtime hours.  So we're going to

5    reduce this timesheet to 40 hours because you did not

6    obtain that approval.  And that is the timesheet that

7    went to Verizon electronically to be paid.

8              There was a backup copy that he e-mailed

9    to -- to Bartech, but all the testimony was that the only

10   way those backup timesheets ever get looked at is if

11   there's some kind of mess up in the electronic

12   submissions.

13             THE COURT:  So what is the Fair Labor

14   Standards Act claim here?

15             MR. LIFSON:  Well, that's a good question,

16   Your Honor.  The -- the Fair Labor Standards Act claim is

17   there's Count I and II which are both based on the Fair

18   Labor Standards Act.  And our position is that based on

19   the undisputed evidence and the testimony that there

20   simply is no claim under that act based on the fact that

21   he -- in dispute and agreed that he accepted an exempt

22   position, and that he's not even seeking an FLSA remedy.

23   He's seeking a straight time remedy which is a contract

24   remedy.  It's not an FLSA remedy.

25             THE COURT:  Well, address the contract issue

1   if you would.  I want to understand your view of the --
2   why it's insufficient.
3               MR. LIFSON:  Sure.  The -- turning to the
4   contract claim, the claim is, as I understand it, is
5   fairly simple that Mr. Schmidt says I was to be paid
6   $47.50 for every hour I worked.  You didn't pay me for
7   these extra 84 and a half hours I worked.  Therefore, you
8   owe me that money.
9               Our response to that is that -- and we've
10  cited a case in our reply brief which says the following.
11  That is, "What is necessarily implied in a contract is as
12  much a part of the instrument as if plainly expressed and
13  will be enforced as such".  And that's the Fourth Circuit
14  *Litman* case from 2008.  And that just states a
15  commonly-known contract principle.
16              Now, perhaps the most fundamental thing that
17  was at least implied in any contract between Mr. Schmidt
18  and Bartech is his obligation to timely and truthfully
19  and accurately report the hours he was working.  Because
20  even as Mr. Schmidt himself testified, if he failed to do
21  that, there is no way for either Bartech or even Verizon
22  to know that he was working those hours.
23              And Mr. Schmidt also testified that because
24  he did not report those extra hours, he did not expect to
25  be paid for them, which raised the question why did

1    you -- why did you bring the suit?

2             But pertaining to the contract claim, he knew

3    his obligation was to timely and accurately record the

4    hours.  He knew it from common sense.  He also knew it

5    from the employee handbook that he acknowledged receiving

6    and reading at the same time that he signed on to accept

7    the job.  And that employee handbook on page 32

8    explicitly emphasizes the importance of accurately and

9    timely reporting his hours, specifically prohibits

10   off-the-clock work and makes it abundantly clear to the

11   employee that is what his obligation is.

12            And he admitted that he never reported those

13   hours.  And he also admitted he never even requested

14   authorization to work the overtime hours.  So there's

15   absolutely no way for either Verizon or for Bartech to

16   know that he was working these hours until he winds up

17   resigning and then submits this claim for all these

18   additional hours he claims to have worked.

19            THE COURT:  I've asked you the questions I

20   have about the FLSA and contract.  Let me hear from

21   Ms. Connolly.

22            MR. LIFSON:  Thank you, Your Honor.

23            MS. CONNOLLY:  Thank you, Your Honor.  If I

24   could just frame the issues that I'm addressing for the

25   Court today.

1        THE COURT:  That would be very helpful.

2        MS. CONNOLLY:  It is whether there has been a

3    prima facie case stated on the undisputed facts that are

4    in evidence before you as to Mr. Schmidt's

5    anti-retaliation -- violation by either Bartech or

6    Verizon of the anti-retaliation provision of the FLSA and

7    whether he stated a claim and has enough evidence in the

8    record to proceed on his wrongful discharge claim under

9    the *Bowman* exception which is a Virginia law state claim.

10        So, that's sort of the issue that I'm here to

11    address.  But before I dive into that, I just wanted to

12    add to something that Mr. Lifson addressed to Your

13    Honor's question about the first timesheet and the hour

14    and a half.

15        We don't actually have any evidence in the

16    record before you that anybody in Verizon actually went

17    in and changed that timesheet.  We have purely

18    Mr. Schmidt's supposition that that has happened.

19    There's been no deposition testimony in fact that that

20    has taken place.  So what we have is in the Bartech

21    record a screen shot of a timesheet reporting an hour and

22    a half above 40 on the first week and nothing else.  It

23    doesn't show up in the Verizon record it's 40 hours in

24    the Verizon records for that particular workweek.  And

25    we're not exactly clear on how that happen.  That answer

1 has not been addressed in discovery.

2     THE COURT:  All right.

3     MS. CONNOLLY:  It's not a dispute of fact.

4 It is just to be clear what the record is before Your

5 Honor.

6     Now, the *Bowman* claim and the retaliation

7 claim in the FLSA are two distinct legal claims, but they

8 fail for the same factual reason, Your Honor.  And that

9 is, Mr. Schmidt did not engage in anything that could

10 constitute protected activity under the purview of the

11 statute, nor could he be deemed to have been exercising

12 any statutory right which would be deemed in the public

13 policy of Virginia sufficient to support a claim under

14 the *Bowman* exception to the at-will doctrine.

15     THE COURT:  But, was his e-mail a complaint?

16     MS. CONNOLLY:  Well, I think that's exactly

17 the key question, Your Honor.  I think there's no dispute

18 between the parties that the February 1st e-mail in fact

19 would be dispositive of this issue.

20     And we've attached the e-mail as Exhibit 19

21 to our papers.  And I'm sure Your Honor has had a chance

22 to look it.

23     THE COURT:  I've had a chance to parse it.  I

24 guess the question is whether the e-mail, which was in

25 response to a request by Ms. --

1          MS. CONNOLLY:  Hajdo.

2          THE COURT:  -- Hajdo to do extra work or do

3    work over the weekend, whether his response to that was a

4    protest that he was being asked to do overtime without

5    pay.

6          MS. CONNOLLY:  Well -- and I think that's

7    exactly what the key question is here.  And if you look

8    at the plain language of his e-mail what he is saying is,

9    I am not willing to, in the future, continue working on

10   this contract if Verizon is unwilling to approve and pay

11   for overtime.

12          What he is not saying in the four corners of

13   this e-mail is in the past, I have worked in excess of 40

14   and I haven't been paid for it, and I insist that you pay

15   me for it.

16          THE COURT:  It doesn't say that does it?

17          MS. CONNOLLY:  It certainly doesn't say that,

18   Your Honor.  It's at Exhibit 19.

19          And the standard that Your Honor should be

20   considering here in whether this constitutes protected

21   activity under the purview of the statute is articulated

22   in the *Kasten* case.  So this is U.S. Supreme Court

23   authority, and if you just bear with me a moment, it's at

24   1335 of the *Kasten* case.

25          And it provides "to fall within the scope of

1   the anti-retaliation provision of the FLSA, a complaint

2   must be sufficiently clear and detailed for a reasonable

3   employer to understand it in light of both the content

4   and the context as an assertion of rights protected by

5   the statute and a call for their protection".

6           So that's the standard as to whether or not

7   protected activity has been engaged in.

8           And the undisputed facts before you, Your

9   Honor, as Mr. Lifson already walked through with you is

10  he never once, other than possibly that first week

11  reported anything in excess of 40.  He admits that nobody

12  is monitoring the amount of time he is working.  At

13  Verizon no one is doing this, nor is anybody doing this

14  at Bartech.

15          THE COURT:  And he was told the first time he

16  submitted the overtime that it was not allowed under the

17  contract.  So he knew that going forward that you're not

18  supposed to claim overtime without authorization.

19          MS. CONNOLLY:  That's precisely right.  I

20  think to clarify your point, Judge, there was a

21  discussion between him and his supervisor, not in

22  connection with his first timesheet but more generalized

23  discussion which happened several weeks later as to

24  whether overtime would be approved and he was told

25  categorically no.

1          And in fact what's in the record and what

2  Mr. Schmidt even admits is Mr. Schmidt said, what do I do

3  if I'm in the middle of a project and I hit my 40?  And

4  he was told you go home.  You go home.  There's no

5  overtime permitted here.

6          So, there's no question, Your Honor, that

7  there was no way that either Verizon or Bartech could

8  have known if he was actually working in excess of 40.

9  He never reported it.  There was no situation which would

10  have given rise to these individual -- individual

11  employees within Verizon or the folks in Bartech to know

12  what he was doing.  And yet, he is asking this Court now

13  to construe his February 1st e-mail as an assertion of

14  some FLSA protected rights even though he doesn't say

15  that and he's speaking aspirationally about what his

16  expectations are for the future.

17          So, for that reason, Your Honor, this e-mail

18  does not constitute protected activity under the scope of

19  the statute nor does it constitute an assertion of some

20  statutory right under the Virginia Code.

21          THE COURT:  Well, he had been paid for the

22  hours he submitted timesheets for at that time, so he

23  wouldn't have had any unpaid wage claim at that time; is

24  that right?

25          MS. CONNOLLY:  That's correct.  There's no

dispute that he was not paid as to the 40 that he submitted.

THE COURT:  All right.

MS. CONNOLLY:  So the issue would be whether there were additional hours that he wasn't paid in violation of 40.1-29.  And that's simply not what his e-mail says.

Now, even if Your Honor was to disagree with defendant's position as to what this undisputed February 1st e-mail actually means and you would view it as some protected activity or assertion of some FLSA right, there's no question that he suffered no adverse action as a result of sending this e-mail.

And, the reason why is simple.  In the same e-mail where he is allegedly asserting his complaint, he's simultaneously resigning.  He specifically says to Ms. Hajdo -- sorry, I'm trying to put my finger on it. But he simultaneously says, see what you need to do to put somebody else on this contract.

Every single person who received this e-mail in February of 2013, whether we're talking about     Ms. Hajdo directly or to the individuals who Ms. Hajdo forwarded it to testified in discovery that they understood his e-mail to constitute a resignation.

THE COURT:  Well, didn't he send an e-mail to

1  Ms. Hajdo suggesting someone else for the job?

2        MS. CONNOLLY:  He did, and that's actually

3  part of our exhibit, number 19 as well.  And that's on

4  page RS-27 of Exhibit 19 at the top.

5        THE COURT:  Are you referring to your

6  brief -- in your initial brief?

7        MS. CONNOLLY:  The opening brief, Your Honor.

8  It's Exhibit 19 at page RS-27 is where you'll find that.

9        THE COURT:  All right.

10        MS. CONNOLLY:  So, Your Honor, there is no

11  question what the undisputed fact and discovery

12  establish.  Yet, Mr. Schmidt is asking this Court to

13  disregard that competent testimony of three witnesses as

14  to what their understanding was contemporaneously with

15  receiving this e-mail and instead credit his subjective

16  belief that either they're lying now as to their

17  understanding of what this e-mail was or that he didn't

18  really mean to resign in sending this e-mail.  Instead he

19  was simply blowing off steam about it and was trying to

20  negotiate the terms of a renewal of his contract.

21        There's no --

22        THE COURT:  Well, he said -- suggest someone

23  else to replace him.  Doesn't that suggest that he was

24  done?

25        MS. CONNOLLY:  In our view, absolutely.

1          THE COURT:  Okay.  Thank you.

2          MS. CONNOLLY:  Thank you.

3          THE COURT:  Let me hear from Mr. Cook.

4          MR. COOK:  Thank you, Your Honor.  John Cook

5    on behalf of plaintiff, Mr. Schmidt.

6               There are two separate claims here.  The

7    smaller claim is over the $4,000 for the unpaid time.

8    But really the crux of the case, the larger claim is the

9    retaliatory discharge claim because we're talking

10   somewhere over $150,000 in loss pay from having lost that

11   job.  So, if it pleases the Court, I'm going to focus on

12   that retaliatory discharge claim initially.

13              I think Your Honor asked the -- exactly the

14   correct question, which is, is this e-mail a complaint

15   under the FLSA?  And, it is.

16              It is not a resignation as suggested by the

17   defendants.  And let me just sort of parse through that a

18   little bit.  If any reasonable person were to look at

19   this e-mail thread and say, gee, I don't know if that's a

20   resignation.  Boy, I'm not sure.  It's a little vague.

21   It's a little ambiguous.  Then for purposes of today's

22   motion, the motion must be denied because we're here at

23   summary judgment, and it is the defendant's burden to

24   prove that no reasonable juror could find that this

25   e-mail is anything other than a resignation.

1          And, I suggest it's not nearly that clear at

2     all.

3          THE COURT:  Well, where in the e-mail do you

4     suggest that he is telling Ms. Hajdo or Lisa, that he is

5     complaining about prior FLSA violations?

6          MR. COOK:  He's complaining about a

7     contemporaneous FLSA violation, and let me explain that.

8          The e-mail chain, the relevant part starts

9     with Ms. Hajdo's e-mail at 12:58 p.m., the paragraph

10    that -- I'm sorry, the -- yes, and where she says, a hard

11    stop after 40 hours isn't really going to work in the

12    long-term either.  I know it's a contract claim, but you

13    can't just not fix a problem because your 40 hours are

14    up.

15         What she's saying is in the long-term,

16    meaning to work here, including this weekend and beyond,

17    contemporaneous time, she's asking him on a Friday to do

18    some work.  You must work over 40 hours, and we know he's

19    not going to get paid.  We know Mr. McCarthy told him

20    first time out beginning of his time there, you're not

21    going to get paid for hours over 40.  Mr. McCarthy said

22    the exact opposite of Lisa.  He said, you stop at 40.

23    You get up.  You walk away.  You're done.

24         THE COURT:  If you would go back to my

25    original question which was where in this e-mail or even

1   Ms. Hajdo's e-mail do you see him complaining that he has

2   done work in excess of 40 hours for which he was not paid

3   overtime?

4           MR. COOK:  That particular question he

5   doesn't say.  What he says is in his --

6           THE COURT:  Well, she doesn't say it either,

7   does she?

8           MR. COOK:  No, what she says is --

9           THE COURT:  Let me finish my point.  My point

10  is if you're complaining about not being paid for

11  overtime, in this case, he is not alleging that he was

12  told to work overtime without pay.  And there's nothing

13  here in the e-mail chain to suggest that.  Is that right?

14          MR. COOK:  No, I disagree.  He is --

15          THE COURT:  Well, show me.  You have the

16  e-mail there.  I have it in front of me.  Where does it

17  say that he worked 40 hours.  She's telling him in the

18  future if you want to keep this contract, then you have

19  to be able to have connectivity from home, and you can't

20  just stop fixing the problem because you're 40 hours are

21  up.

22          MR. COOK:  Right, not just in the future, but

23  that day, right.  Remember, what starts this is she says

24  I want you to run these programs tonight.  He said I'm

25  leaving at 3 o'clock and she says, you know, hard stop at

1   40 hours aren't going to work.  So, today, as your boss,

2   I'm telling you to work over 40 hours, even though we

3   know you're not going to get paid.  And he says, I'm not

4   going to do it.

5            Right.  So, here's the response which is, you

6   know, I'm not going to work over 40 hours if I'm not

7   going to get paid.  But he says, if Verizon is willing to

8   approve and pay for overtime, this is a quote, then I'll

9   certainly do what is needed after the 40.

10           He's not resigning.  He's saying provided I'm

11  going to be paid under the law and under my contract, I

12  will do the work.  Because what Lisa is telling him is

13  that he should give up his rights.  She's saying you

14  should work over the 40.  You should work tonight, this

15  day, and not get paid.

16           THE COURT:  I've read what you just said.

17  There's no complaint here about prior overtime being work

18  without pay.  Do you agree with that?

19           MR. COOK:  That's correct.

20           THE COURT:  And in this instance, he was

21  being asked to upload some software over the weekend and

22  he's complaining that I'm not going to do it unless I'm

23  paid.  And then he says -- and this is the part that I

24  want you to address and that is where she asked him

25  about -- he says, "I don't have to think hard at all",

1  ellipsis, "talk to O'Neil about contacting Bartech to

2  cancel the contract or request that Bartech find a

3  replacement for me".

4        How -- what does that mean to you?

5        MR. COOK:  That's the first part of the

6  thought that he's conveying in this e-mail.  The

7  second --

8        THE COURT:  When she told him about doing the

9  work and he says "I don't have to think long at all about

10 that.  As a matter of fact, contact Bartech to cancel the

11 contract or request that Bartech find a replacement for

12 me.  And I'll also contact Bartech to advise them of your

13 concerns".

14        Is that a resignation to you?

15        MR. COOK:  No, because you've only read half

16 of what you said.

17        THE COURT:  The whole thing is in front --

18        MR. COOK:  And I realize that.  But what I'm

19 saying is you can't parse it that way.  Because his

20 message isn't I'm not going to work.  His message is,

21 when you read both paragraphs together, is if you're

22 telling me to work without pay, I'm not going to do it.

23 Get somebody else.  But if you're telling me you're going

24 to pay me, I'm willing to do the work.

25        That's a perfectly reasonable thing for

 1   anybody to say.  And so, he's not saying I resign

 2   tonight.  He's saying, if you tell me to do work without

 3   pay, my answer is no.  I don't need to think about it.

 4   He says my answer is no.

 5             Now, if you're telling me you're going to pay

 6   me -- and remember, the history here.  He's already been

 7   told by his boss no hours over 40, and he already had a

 8   circumstance where he did work over 40 and his timesheet

 9   got changed.  So there's a con -- a concept here, a

10   context.  And he says --

11             THE COURT:  Would you also address the same

12   day, February 1, at 2:30 p.m., "perhaps the former

13   co-worker who Verizon contract was canceled into 2012

14   would best suit your needs.  He's very intelligent, good

15   with SAS and has connectivity from home and is just a few

16   minutes from the Ashburn campus".

17             So this is a few minutes after his 2:21

18   e-mail.  So you're saying that his suggesting someone

19   else to replace him is not -- should not confirm he's

20   quit?

21             MR. COOK:  What he's saying is there are two

22   paths here.  If you're -- if your path, Verizon, is you

23   want me to work without pay, I'm not going down that

24   path.  If you're going to pay me like the law requires

25   you to, great, ready to do it.  And then he says, and,

1  hey, if you're going to go down the path of violating my

2  rights which I said I'm not going to do, maybe, you know,

3  you can ask this guy if he wants the job.

4            So you have to put these comments into

5  context.  There's a fork in the road, and one fork is a

6  violation of the law and the other is that his rights are

7  honored.  And he says --

8            THE COURT:  Yogi Berra said when you come to

9  the fork in the road, take it.

10            MR. COOK:  That's right.

11            THE COURT:  I don't think we have that here.

12            MR. COOK:  What we have is Mr. Schmidt saying

13  I'm ready to continue working provided I'm paid like the

14  law says I'm supposed to be paid.  And Verizon is saying

15  through Ms. Hajdo, essentially, I want somebody who is

16  going to work without getting paid.  And, that's the --

17            THE COURT:  I don't think she wanted someone

18  who would work without getting paid.  She said -- and

19  maybe it's just me.  She seems to suggest that an IT

20  professional should have connectivity at home and that he

21  doesn't, which is to her a problem for being able to

22  access the system and to fix it.

23            And many -- I don't want to go any further

24  than that.  That's what I just read out of this.

25            MR. COOK:  And then when you go on, when she

1    says a hard stop at 40 isn't going to be possible.

2              THE COURT:  Well, when the system goes down,

3    Mr. Cook, what happens?  He's just to wait until the next

4    40 hours for the repairs to begin.

5              MR. COOK:  That's up to Verizon.  They can

6    pay him to do the work or they can have him wait.

7    Mr. McCarthy told them wait.  Mr. McCarthy said when your

8    40 hours are up, you walk out the door.

9              THE COURT:  The whole thing is unclear to me

10   and that is did he set his own schedule or did he have a

11   time clock schedule?  I had the impression he worked from

12   7 to 3.  That was by his choice because of his commute.

13   That wasn't because Verizon told him, go the 40.  So,

14   then in other words, his availability was determined

15   by -- he determined himself.  And so he decided what

16   hours he would be available.  So he could work 40 hours

17   on Saturday on Sunday as long as he worked no more than

18   40 hours in the course of a week; is that right?

19             MR. COOK:  Nobody at Verizon or Bartech told

20   him this is the hour you must clock in, that's correct.

21   Now, of course, on this particular day, it's Friday.  The

22   week's up.  He has hit his 40 hours.

23             So, there's some suggestion in the deposition

24   testimony that well, you know, he can just massage his

25   schedule to not go over 40.  But what we're seeing in

this particular e-mail, which is the crux of the whole case is Ms. Hajdo saying, hey, you know, if the work is needed, I expect you to work over 40 hours.

And Mr. Schmidt's looking at that next to Mr. McCarthy who said, you're not getting paid over 40 hours and I expect you to walk away at hour 40, period.  And so what Mr. Schmidt is saying, and Mr. Schmidt has the experience of having gone over the 40, his first week or two there and not getting paid.

THE COURT:  He did so without authorization. Is there anything in this e-mail chain to suggest he could not go back to Bartech and get authorization for overtime?

MR. COOK:  Not in this chain, but Mr. McCarthy's testimony -- the testimony --          Mr. Schmidt's testimony was they told me don't ask.  We don't give it.  So that's the context.

THE COURT:  All right.  Well, let me ask you now to focus if you would on the FLSA claim because I think I understand your retaliation argument.  You're asking for just straight time, not overtime?

MR. COOK:  That's correct.  That's correct.

THE COURT:  All right.

MR. COOK:  And what we -- and, when I read the defendant's reply brief, because they seem to get

1  into this overtime issue.  So I went back to look at our

2  brief and just to see the source of that confusion.

3          The term overtime is used by the fact

4  witnesses in the case to represent hours over 40.

5          So, as lawyers, we say, oh, you're asking for

6  time and a half.  That's not what people were talking

7  about.  It's all straight time.

8          But, it is true, and it's not a legal issue

9  that we have to resolve for this case.  But, you lose

10  your exemption or the company losses its exemption for

11  you if they don't pay you in accordance to what the

12  exemption requires.

13          So, you may be IT exempt.  Two things have to

14  happen for you to be IT exempt.  You have to have the job

15  duties which everyone acknowledges Mr. Schmidt had, and

16  you have to be paid at least 27.50 an hour for every work

17  you work, including hours over 40.

18          So, if you're not paid, then all of a sudden,

19  that raises the issue is the exemption gone.  Just like

20  in a salary case where you have an exempted salary

21  employee and there's a partial day absence where they're

22  docked.  And what the law says is once you've docked a

23  partial day absence, you've converted that person to

24  hourly.  They've loss the exemption.  Now they're paid

25  time and a half.

1       So why that is all relevant here is that that

2   shows that this discussion is related to the FLSA.   The

3   discussion about am I going to get paid for my hours over

4   40?  The discussion about gee, if I'm not paid am I

5   losing my exception?  Those questions are related to the

6   FLSA.  And what the retaliation provision of the FLSA

7   says if you make a complaint, and I think a jury can

8   certainly find that this is a complaint.  I don't want to

9   work over 40 hours and not get paid.

10      If that complaint is related to the FLSA,

11  then, you have made -- that's protected activity and

12  that's what's happened here.

13      If Mr. Schmidt had said I don't want to work

14  and not get paid, on the facts, he is saying, I want my

15  rights honored.  I want to get that straight time over

16  40.  And the company says you're out of here.

17              THE COURT:  All right.

18              MR. COOK:  Retaliatory action.

19              THE COURT:  All right.  Thank you very much.

20              MR. COOK:  Thank you, Your Honor.

21              MR. LIFSON:  Your Honor, I only have two

22  points to make in response to what Mr. Cook has said.

23      Mr. Cook just said you can lose the exemption

24  if you're not paid to the extent that the exemption

25  requires.

1    Well, the exemption here requires that an IT

2    exempt employee be paid $27.63 per hour.  And there is no

3    dispute here that even if we give Mr. Schmidt credit for

4    all of the hours over 40 that he claims to have worked,

5    his compensation was way above that figure.

6         But, the point that we made in our reply

7    brief is that the Court doesn't even need to get to that

8    analysis because as Mr. Cook confirms, Mr. Schmidt is not

9    seeking a FLSA remedy.  Therefore, it's not a FLSA claim.

10   It's not a FLSA case.  It's a breach of contract case.

11        And the only other point in this pertains to

12   the retaliation claim.  There are really two retaliation

13   claims, one under *Bowman*, one under the FLSA.  But if

14   there's no FLSA claim, there can't be retaliation claim

15   under the FLSA either, Your Honor.

16        THE COURT:  All right, thank you very much.

17        MS. CONNOLLY:  Your Honor, I too just have

18   two points to address based on what Mr. Cook said in his

19   argument.

20        If I heard him correctly, I think what he is

21   espousing to you is that somehow this February 1st e-mail

22   attached as Exhibit 19 to our opening brief really was an

23   assertion of an FLSA protected right because in his view,

24   Lisa Hajdo was asking him to work above 40 on that day.

25   Mr. Cook said today.  She was asking -- she was asking

1   Mr. Schmidt to do this today.

2               But, if you look at the e-mail string and you

3   look at the 12:58 p.m. e-mail from Ms. Hajdo back to

4   Mr. Schmidt, what she says to him in response to him

5   saying I'm over 40.  I was planning to leave at 3:15

6   today is I'll do it tonight.

7               So, there is no insistence in this e-mail

8   string that no, I've heard that you've hit your 40 and

9   I'm insisting that you stay.  She backs off and says,

10  I've got it.

11              So I just wanted to clarify, Your Honor, that

12  that new argument that we heard does not convert this

13  e-mail string into a protected activity encompassed by

14  the statute.

15              THE COURT:  All right, thank you very much.

16              MS. CONNOLLY:  May I just address one more

17  point, Your Honor --

18              THE COURT:  Yes.

19              MS. CONNOLLY:  -- as to resignation?

20              Just to address what Mr. Cook said, I think

21  what he submitted to you is this ambiguity to the extent

22  there is one around whether he resigned needs to be

23  submitted to the jury.  That's not the relevant inquiry.

24  It's what the witnesses understood it to be at the time

25  that they received it, which informed their subsequent

1   action.

2           THE COURT:  What you're saying is what

3   management thought the e-mail meant.

4           MS. CONNOLLY:  Exactly.  And there's no

5   dispute about that.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           All right.  Counsel, this matter requires a

9   written opinion.  So I'll issue a written opinion, and I

10  thank you for the quality of your participation.

11          You're excused.  Thank you.

12          MR. LIFSON:  Thank you, Your Honor.

13          (Proceeding concluded at 11:09 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2

3          I, Renecia Wilson, an official court

4  reporter for the United State District Court of Virginia,

5  Alexandria Division, do hereby certify that I reported by

6  machine shorthand, in my official capacity, the

7  proceedings had upon the motions in the case of Robert

8  Schmidt vs. Bartech Group, Inc., et al.

9          I further certify that I was authorized and

10  did report by stenotype the proceedings and evidence in

11  said 31, and that the foregoing pages, numbered 1 to 32,

12  inclusive, constitute the official transcript of said

13  proceedings as taken from my shorthand notes.

14          IN WITNESS WHEREOF, I have hereto subscribed

15  my name this <u>8th</u> day of <u>January</u>, 2015.

16

17                              /s/
                         _____
                         Renecia Wilson, RMR, CRR
18                       Official Court Reporter

19

20

21

22

23

24

25